IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

NATHANIEL BARNES,

    Petitioner,

vs.                                       Cv. No. 04-2577-Ml/An

T.C. OUTLAW,

    Respondent.

_____

ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
ORDER OF DISMISSAL
ORDER DENYING MOTIONS FILED BY PETITIONER AS MOOT
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
_____

On July 27, 2004, Petitioner Nathaniel Barnes, Bureau of Prisons ("BOP") inmate registration number 22973-001, an inmate at the Federal Correctional Institution at Memphis, filed this petition under 28 U.S.C. § 2241. On March 31, 2005, the Court directed the Respondent to answer the petition. On April 25, 2005, Warden Outlaw filed a motion to dismiss or for summary judgment, along with a memorandum supported by the affidavits of Clarrisa Greene, Legal Instruments Examiner; Timothy Smart, Disciplinary Hearing Officer; and Dr. Nahem Naimey, Clinical Director.

On May 4, 2005, Petitioner filed his response to the motion for summary judgment, which he also characterized as Petitioner's motion for summary judgment. Simultaneously, Petitioner filed an answer to the motion for summary judgment which is also styled as a motion for writ of habeas corpus. On May 31, 2005, the

Respondent replied, opposing Petitioner's motion for summary judgment. On June 8, 2005, Petitioner replied to Outlaw's opposition. On September 28, 2005, Petitioner filed a motion for an evidentiary hearing and renewed his motion for summary judgment. On October 4, 2005, Outlaw responded.

Barnes challenges a disciplinary offense for his alleged use of marijuana, contending that he was deprived of due process during disciplinary proceedings and deprived of equal protection in the degree of punishment imposed. He alleges that he takes a prescribed medication which creates a false positive when urine is tested for marijuana use. Barnes seeks expungement of the conviction and the restoration of 41 days of good conduct time.

I.  Respondent's Motion for Summary Judgment

   A.  Statement of Material Facts

   1.  Petitioner was convicted of Theft or Embezzlement of Bank Funds by a Bank Employee under 18 U.S.C. § 656 in the United States District Court for the Northern District of Alabama and sentenced to 48 months imprisonment, along with a 60 month term of supervised release. Petitioner is housed at FCI Memphis with a projected release date of September 28, 2006. (Greene Aff. Attach. A.)

   2.  On November 3, 2003, Senior Officer Specialist E. Futrell requested Petitioner submit to a random urine analysis in order to test for illegal drug use. Petitioner submitted his urine and signed a Chain of Custody for Drug Analysis form certifying that the urine specimen was sealed in his presence and that the identifying information on the label was correct. Petitioner's sample and identifying paperwork were sent to National Toxicology Laboratories, Inc. ("NTL"), the BOP's contractual toxicology laboratory, for analysis. On November 5, 2003, NTL reported that Petitioner's urine tested positive for

       THC Metabolite, the drug commonly known as marijuana. Futrell sent the results by memorandum dated November 6, 2003, to the investigating lieutenant. The memorandum was also signed by Dr. Naimey who stated that his review of Petitioner's medical records showed no evidence indicating that the inmate was prescribed medication which would result in a false positive result for marijuana. (Smart Aff. and Ex. A, B, and C.)

3. Despite Dr. Naimey's initial certification that Petitioner took no medication which would cause a positive result, he noticed that Petitioner was taking the drug Sustiva, which could result in a false positive for marijuana. Because the medical literature suggest utilizing a more specific test to rule out a false positive, Dr. Naimey called the laboratory to request the more specific test. NTL performed the more specific test which also showed Petitioner's urine was positive for marijuana. Dr. Naimey communicated the results of the second test to the investigating lieutenant on November 12, 2003 and amended his memorandum confirming he found no evidence that Petitioner's medication caused a false positive. (Naimey Aff. and Ex. A Smart Aff. and Ex. D and E.)

4. On November 12, 2003, Officer Futrell issued petitioner an Incident Report charging him with "Use of Narcotics." The Report indicated Petitioner's medical records were reviewed by medical staff revealing no prescribed medications which would result in a false positive for marijuana. A copy of the Incident Report was delivered to Petitioner on the same day and he was placed in Administrative Detention pending a disciplinary hearing.

5. On November 13, 2003, petitioner appeared before the Disciplinary Committee ("UDC"). He denied marijuana use and claimed the positive test resulted from his prescribed medication. The Disciplinary Committee referred the charges to the Disciplinary Hearing Officer ("DHO") for further determination. Petitioner was advised of his rights before the DHO. When the DHO received Petitioner's file, DHO Smart could not read Dr. Naimey's handwriting

      on the amended portion of the memorandum. Since the DHO was also aware that Sustiva may cause an initial false positive during drug testing, he contacted Dr. Naimey in order to request a re-test of Inmate Barnes' urine sample. At that time, Dr. Naimey informed DHO Smart he had already requested a more specific test be performed to rule out the possibility that the preliminary results indicated a false positive, and that the NTL performed the additional test which yielded positive results for marijuana.

6. After speaking with Dr. Naimey, DHO Smart requested confirmation from the Special Investigative Supervisor ("SIS") Office that the additional test which was performed was the proper test to use per the contracted procedure between the BOP and NTL. On December 12, 2003, the SIS Office informed DHO Smart that the test performed, the gas chromatography, was indeed the proper test. The SIS Office also informed him that the gas chromatography differentiates between Efavirenz (Sustiva) and marijuana and that this test confirmed that petitioner's urine tested positive for marijuana. On December 15, 2003, DHO Smart received a typed message from Dr. Naimey which clarified his earlier handwritten notes on the memorandum dated November 12, 2003.

7. On December 30, 2003, DHO Smart conducted a DHO hearing with Petitioner in order to address the marijuana use charges. Although during the UDC hearing, petitioner had previously invoked his right to a staff representative and right to call witnesses, Petitioner willingly waived those rights at the DHO hearing by initialing the Notice of Discipline Hearing Before the DHO form. At the beginning of the hearing, DHO Smart reviewed with Petitioner his rights and the reasons for the delay in his hearing. DHO Smart explained to petitioner that he had requested additional documentation from various staff to ensure that Petitioner's rights were being upheld and to ensure that staff were following BOP guidelines concerning the re-testing of this urine sample. DHO Smart informed Petitioner of the gas chromatography test which differentiates

4

       between marijuana use and his prescribed medication and that Dr. Naimey had confirmed Petitioner's positive result with NTL. DHO Smart also showed Petitioner NTL's results from the re-test, which indicated that his urine was indeed positive for marijuana. After the hearing, DHO Smart recorded and recalled that Petitioner admitted that he had smoked a joint the day before he submitted his urine specimen. DHO Smart found that Petitioner had committed the prohibited act as charged after considering the Incident Report, the Chain of Custody Form, the first NTL Report, Futrell and Naimey's memo, and the second NTL report. (Smart Aff. and Ex. E, F, G, and H.)

8. Petitioner denies that he made a statement that he had smoked marijuana. He contends that non-Black inmates who tested positive for marijuana have not received such harsh sanctions. He alleges that he has stopped taking Sustiva and since has never tested positive for marijuana. Barnes contends that he brought the need for a gas chromatography test to Naimey's attention and that Smart never discussed the reason for the delay of the disciplinary hearing with him. (Decl. Barnes.)

9. Barnes contend that prison staff violated BOP policy by contacting the lab themselves to request the gas chromotography test. He questions the chain of custody of his urine specimen and surrounding lab conditions after the first test, although he admits that the validity of the test cannot be questioned at the disciplinary hearing. He contends that the second test violated BOP regulations which require a thirty day waiting period before another urine specimen is collected. He also contends his right to due process was violated by the delay before his disciplinary hearing. (Resp. Barnes.)

    B.   <u>Standard of Review</u>

The Respondent relies on the affidavits of Clarrisa Green, Timothy Smart, and Dr. Nahem Naimey. Therefore, the motion to

dismiss must be treated as one for summary judgment. See Fed. R. Civ. P. 12(b).

> Under Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," id. at 323, the nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party is unable to make such a showing, summary judgment is appropriate.

Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989). In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986).

Pursuant to Rule 56(e), a "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citations omitted). A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." Id. In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

C.  Analysis

This Court must determine whether the Respondent has established the absence of a genuine issue of material fact as to Petitioner's claims. Habeas relief for a federal prisoner is available if the prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. Accordingly, Barnes is entitled to habeas relief only if the BOP is confining him in violation of the Constitution or laws of the United States. Reduced to its essence, the issue is thus whether Barnes can claim a right to due process in connection with a disciplinary proceeding and the revocation of sentence credits, and not whether the BOP has merely interpreted its regulations correctly in conducting one or more disciplinary proceedings.

1.  Due Process

A prison inmate has no right not to be convicted of prison disciplinary offenses, but only a right to due process if the conviction deprives him of a liberty interest recognized by federal law. See generally Wolff v. McDonnell, 418 U.S. 539, 564-71 (1974)(defining scope of due process application to prison disciplinary hearings).[1] In general,

---

[1]  Even when a liberty interest is at stake, the scope of due process in prison disciplinary cases is very narrow. See Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 455-56 (1985)(holding disciplinary findings satisfy due process if supported by any evidence, however meager); Ponte v. Real, 471 U.S. 491, 495-99 (1985)(finding disciplinary board need not make contemporaneous record of reasons live witnesses for inmate not allowed); Baxter v. Palmigiano, 425 U.S. 308, 319-323 (1976)(holding disciplinary board may draw adverse inference from inmate's silence; inmate has no right to cross-examination); Wolfel v. Morris, 972 F.2d 712 (6th Cir. 1992)(holding inmate not deprived of due process by disciplinary charge because acquittal precluded claim of cognizable injury); Hensley v. Wilson, 850 F.2d 269 (6th Cir. 1988)(requiring

> [a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

Montanye v. Haymes, 427 U.S. 236, 242 (1976).

Previously, courts analyzed prison disciplinary cases by considering whether "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State [or federal government] has created a protected liberty interest." Hewitt v. Helms, 459 U.S. 460, 472 (1983). Because the BOP has regulations governing discipline in federal prisons, 28 C.F.R. §§ 541.2 - 541.68, a number of courts had concluded that those regulations, construed together with the remaining regulations defining disciplinary offenses, penalties, and the roles and duties of the various disciplinary officials, placed substantive limitations on the discretion of BOP employees to confine an inmate to disciplinary segregation, and thus created a protected liberty interest, so that an inmate was entitled to due process in connection with the imposition of disciplinary segregation. See Young v. Kann, 926 F.2d 1396, 1399 (3d Cir. 1991)(finding that BOP regulations codify procedural requirements enunciated in Wolff);

---

contemporaneous record for in camera court review if disciplinary conviction not supported by other adequate evidence); Hudson v. Edmonson, 848 F.2d 682 (6th Cir. 1988)(citing Hill and holding decision on appropriate sanctions should not be second-guessed upon review); Turney v. Scroggy, 831 F.2d 135 (6th Cir. 1987)(holding court may not reexamine disciplinary board's credibility choices in weighing evidence at hearing).

Adams v. Gunnell, 729 F.2d 362, 368 (5th Cir. 1984)(finding that BOP regulations create liberty interest).

In Sandin v. Conner, 515 U.S. 472, 484-87 (1995), the Supreme Court, without explicitly overruling Hewitt, returned to the question left open in Wolff--whether inmates have a liberty interest in freedom from segregation, punitive or administrative. The court concluded that they do not.

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also Bd. of Pardons v. Allen, 482 U.S. 369 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, e.g., Vitek, 445 U.S. at 493 (transfer to mental hospital), and Washington, 494 U.S. at 221-222 (involuntary administration of psychotropic drugs), nonetheless impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.
> 
> * * *
> 
> Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation. Neither Bell v. Wolfish, 441 U.S. 520 (1979), nor Ingraham v. Wright, 430 U.S. 651 (1977), requires such a rule. . . . We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. . . . We hold, therefore, that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in Wolff. The regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life.

Sandin, 515 U.S. at 483-84, 486, 487 (footnotes and some citations omitted). Sandin thus focused not on the content of regulations, but on the "nature of the deprivation" visited upon the inmate.

9

Id. at 481. Absent "atypical and significant hardship," a change in the conditions of the prisoner's confinement simply does not inflict a cognizable injury that merits constitutional protection, regardless of the motivation of the official when making the change. Id. at 484-86.

Accordingly, federal courts no longer look to language in laws or BOP regulations in connection with prison assignment claims to determine if a prisoner is deprived of any liberty interest protected by the Due Process Clause. Rimmer-Bey v. Brown, 62 F.3d 789, 790-91 (6th Cir. 1995). Neither do the courts consider the subjective motives of prison officials. Instead, the court focuses on the nature of the deprivation itself.

> After [Sandin], prisoners may no longer peruse state statutes and prison regulations searching for the grail of limited discretion. Instead, a prisoner has a liberty interest only in "freedom[s] from restraint . . . impos[ing] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

Orellana v. Kyle, 65 F.3d 29, 31 (5th Cir. 1995). According to Orellana, only deprivations that clearly impinge on the duration of confinement, will henceforth even possibly qualify for constitutional "liberty" status. Id. at 31-32. Thus, Petitioner has no liberty interest in his disciplinary punishment and fails to state a claim on this ground.

Barnes also challenges the reduction in his sentence credits. However, there is no right under the Constitution to earn or receive sentence credits. Hansard v. Barrett, 980 F.2d 1059, 1062 (6th Cir. 1992).

> [T]he Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison, despite the undoubted impact of such credits on the freedom of inmates.

Hewitt v. Helms, 459 U.S. 460, 467-68 (1983)(quoting Wolff v. McDonnell, 481 U.S. 539, 557 (1974)).  Furthermore, "good time credits reduce only the period of incarceration, not the sentence itself."  Raines v. U. S. Parole Com'n, 829 F.2d 840, 844 (9th Cir. 1987).  Neither is there any fundamental right to parole or to release from a sentence of incarceration that has itself been lawfully imposed.  See Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979).  Thus petitioner has no due process claim because he was deprived of sentence credits or the opportunity to earn sentence credits.

To the extent plaintiff is deprived of statutory good time due to his disciplinary convictions, any effect on the total period of time he will serve in prison is too uncertain and attenuated to constitute the deprivation of a liberty interest.  See Sandin, 515 U.S. at 487 (noting that any possible effect on the plaintiff's future release was too attenuated to constitute a deprivation of a liberty interest protected by the Due Process Clause).  Petitioner is thus not entitled to any of the procedural protections enunciated in Wolff or its progeny.

    2.   Equal Protection

Barnes also claims that his right to Equal Protection was violated.  A prison inmate cannot

> make out a violation of his equal protection rights simply by showing that other inmates were treated differently.  He would have to show that he was victimized because of some suspect

11

> classification, which is an essential element of an equal protection claim.

Newell v. Brown, 981 F.2d 880, 887 (6th Cir. 1992)(citation omitted). Plaintiff claims he received harsh punishment because he is a homosexual black man.

It is incumbent on one asserting an equal protection claim to prove the existence of some purposeful discrimination. McCleskey v. Kemp, 481 U.S. 279, 292 (1987). A plaintiff must establish that a government official intentionally discriminated against him because of his membership in a protected class, or because of his poverty, race, or some other unreasonable classification. See Henry v. Metropolitan Sewer Dist., 922 F. 2d 332, 341 (6th Cir. 1990); Joyce v. Mavromatis, 783 F.2d 56, 57 (6th Cir. 1986). Plaintiff's claim is comprised of conclusory allegations and speculation that non-black or heterosexual inmates receive more favorable treatment by prison officials. He provides no supporting facts or affidavits demonstrating comparable circumstances.

The mere fact that on some occasions a heterosexual or non-black inmate received favorable treatment does not elevate plaintiff's claim into a matter of constitutional concern. Without specific or concrete factual allegations of discrimination, plaintiff's equal protection claim is frivolous. Gutierrez v. Lynch, 826 F.2d 1524, 1538 (6th Cir. 1987) ("It is well-settled that . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state . . . a claim."

D.  Conclusion

For all the foregoing reasons, the Court GRANTS defendant's motion for summary judgment.  Barnes is not entitled to relief and the petition is DENIED.  This determination renders all remaining pending motions filed by Barnes MOOT and those motions are DENIED.

II.  Certificate of Appealability and In Forma Pauperis

Appeals of habeas petitions under 28 U.S.C. § 2254 and motions under 28 U.S.C. § 2255 are governed by 28 U.S.C. § 2253 and require the district court to consider whether to issue a certificate of appealability.  Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063 (6th Cir. 1997).  Section 2253 does not apply to habeas petitions by prisoners seeking review of federal agency determinations under § 2241.  McIntosh v. United States Parole Comm'n, 115 F.3d 809, 810 (10th Cir. 1997); Ojo v. I.N.S., 106 F.3d 680, 681-82 (5th Cir. 1997); Bradshaw v. Story, 86 F.3d 164, 166 (10th Cir. 1996).  Nevertheless, a habeas petitioner seeking to appeal is still obligated to pay the $255 filing fee required by 28 U.S.C. §§ 1913 and 1917.[2]  Under the Prison Litigation Reform Act of 1995 (PLRA), 28 U.S.C. § 1915, it is unclear how habeas petitioners establish a right to proceed in forma pauperis and avoid this filing fee.

---

[2]   The fee for docketing an appeal is $250.  See Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913.  Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.

13

Although the Sixth Circuit has concluded that the various filing fee payment requirements and good faith certifications of amended § 1915 do not apply to § 2254 cases, it has not resolved whether these requirements apply to § 2241 cases. Kincade v. Sparkman, 117 F.3d 949, 951-52 (6th Cir. 1997); cf. McGore v. Wrigglesworth, 114 F.3d 601 (6th Cir. 1997)(instructing courts regarding proper PLRA procedures in prisoner civil-rights cases, without mentioning § 2241 petitions).

The Tenth Circuit, however, has held that the provisions of the PLRA do not apply to habeas cases of any sort or to § 2255 motions. See McIntosh, 115 F.3d at 810; United States v. Simmonds, 111 F.3d 737, 743 (10th Cir. 1997). An unpublished Sixth Circuit opinion has adopted this approach in affirming a decision from this district. Graham v. U.S. Parole Com'n, No. 96-6725, 1997 WL 778515 (6th Cir. Dec. 8, 1997), aff'g Graham v. United States, No. 96-3251-Tu (W.D. Tenn. Dec. 4, 1996). Because the court finds the reasoning of McIntosh persuasive and that this conclusion naturally follows from the Sixth Circuit's decision in Kincade, the court concludes that the PLRA does not apply to § 2241 petitions.

Pursuant to Kincade, a petitioner must seek leave to proceed in forma pauperis from the district court under Fed. R. App. 24(a), which provides:

> A party to an action in a district court who desires to proceed on appeal in forma pauperis shall file in the district court a motion for leave to so proceed, together with an affidavit, showing, in the detail prescribed by Form 4 of the Appendix of Forms, the party's inability to pay fees and costs or to give security therefor, the party's belief that that party is entitled to redress,

      and a statement of the issues which that party intends to present on appeal.

The Rule further requires the district court to certify in writing whether the appeal is taken in good faith, and to deny the certificate if the appeal would be frivolous.

The good faith standard is an objective one. <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962). The same considerations that lead the Court to grant the respondent's motion for summary judgment and dismiss this petition as devoid of merit also compel the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to F.R.A.P. 24(a), that any appeal in this matter by petitioner is not taken in good faith, and he may not proceed on appeal <u>in forma pauperis</u>.

IT IS SO ORDERED this 30th day of March, 2006.

                                              <u>/s/ Jon P. McCalla</u>
                                              JON PHIPPS MCCALLA
                                              UNITED STATES DISTRICT JUDGE